# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

BERNARD THOMAS, as parent )
of K.C.T., a minor on behalf of )
KORIE ELIZABETH STEVENS, )
Deceased, )
                                  )
             Plaintiff, )
                                  )
v. )        Case No. CIV-20-307-RAW-SPS
                                  )
KILOLO KIJAKAZI,[1] )
Acting Commissioner of the Social )
Security Administration, )
                                  )
             Defendant. )

## REPORT AND RECOMMENDATION

      In this case, Bernard Thomas is the parent of K.C.T., who is a minor appearing on behalf of her mother the claimant, Korie Elizabeth Stevens, deceased. The claimant's representative requests judicial review of a denial of benefits by the Commissioner of the Social Security Administration pursuant to 42 U.S.C. § 405(g). He appeals the Commissioner's decision and asserts that the Administrative Law Judge ("ALJ") erred in determining Ms. Stevens was not disabled. For the reasons discussed below, the Commissioner's decision should be REVERSED and the case REMANDED to the ALJ for further proceedings.

---

[1] On July 9, 2021, Kilolo Kijakazi became the Commissioner of Social Security. In accordance with Fed. R. Civ. P. 25(d), Ms. Kijakazi is substituted for Andrew M. Saul as the Defendant in this action.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[.]" 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id*. § 423 (d)(2)(A). Social security regulations implement a five-step sequential process to evaluate a disability claim. *See* 20 C.F.R. §§ 404.1520, 416.920.[2]

Section 405(g) limits the scope of judicial review of the Commissioner's decision to two inquiries: whether the decision was supported by substantial evidence and whether correct legal standards were applied. *See Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

---

[2] Step one requires the claimant to establish that she is not engaged in substantial gainful activity. Step two requires the claimant to establish that she has a medically severe impairment (or combination of impairments) that significantly limits her ability to do basic work activities. If the claimant *is* engaged in substantial gainful activity, or her impairment *is not* medically severe, disability benefits are denied. If she *does* have a medically severe impairment, it is measured at step three against the listed impairments in 20 C.F.R. Part 404, Subpt. P, App. 1. If the claimant has a listed (or "medically equivalent") impairment, she is regarded as disabled and awarded benefits without further inquiry. Otherwise, the evaluation proceeds to step four, where the claimant must show that she lacks the residual functional capacity ("RFC") to return to her past relevant work. At step five, the burden shifts to the Commissioner to show there is significant work in the national economy that the claimant *can* perform, given her age, education, work experience, and RFC. Disability benefits are denied if the claimant can return to any of her past relevant work or if her RFC does not preclude alternative work. *See generally Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

*Richardson v. Perales*, 402 U.S. 389, 401 (1971), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). See also *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). The Court may not reweigh the evidence or substitute its discretion for the Commissioner's. *See Casias v. Secretary of Health & Human Services*, 933 F.2d 799, 800 (10th Cir. 1991). But the Court must review the record as a whole, and "[t]he substantiality of the evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *see also Casias*, 933 F.2d at 800-01.

## Claimant's Background

The claimant was deceased at the time of the most recent administrative hearing where she was represented by her daughter, although she was thirty-four years old on the alleged onset date (Tr. 33, 228, 1408). She completed high school and at least three years of college, and had worked as an office manager, pharmacy technician, and nurse aide (Tr. 250, 1396). The claimant alleged that she had been unable to work since February 16, 2010, due to degenerative disc disease, panic attacks, osteoarthritis, diabetes, gout, dysthymic depression, fibromyalgia, lack of cartilage in her knees, tennis elbow, and bilateral carpal tunnel syndrome (Tr. 249).

## Procedural History

On May 29, 2013, the claimant applied for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and she applied for supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-85, on May 31, 2013. She alleged disability beginning May 28, 2013 (Tr. 33). The

applications were denied. ALJ Doug Gabbard, II, conducted an administrative hearing and determined that the claimant was not disabled in a written opinion dated February 10, 2015 (Tr. 33-47). The Appeals Council denied review, but this Court reversed and remanded to the ALJ on September 22, 2017, in Case No. CIV-16-190-SPS (Tr. 741-753). In the interim, the claimant filed a second claim for Title XVI supplemental security income benefits on March 28, 2016, and she was found disabled as of that protected filing date (Tr. 1378). The Appeals Council affirmed this decision, and limited the review period from February 16, 2010 through March 27, 2018 (Tr. 1475-1476). On remand, ALJ J. Leland Bentley conducted a second administrative hearing and found that, for the period of February 16, 2010 through March 27, 2016, the claimant was not disabled, in a written decision dated August 23, 2018 (Tr. 648-663). The claimant passed away on December 24, 2018 (Tr. 1381). The Appeals Council again denied review of ALJ Bentley's August 2018 opinion, but this Court again reversed and remanded the ALJ's decision on July 31, 2019, following an unopposed Motion to Remand in Case No. CIV-18-362-JHP-SPS (Tr. 1469-1472). On remand, ALJ Bentley held a third administrative hearing at which the claimant's daughter testified, and again determined that the claimant was not disabled for the closed period, in a written decision dated May 12, 2020 (Tr. 1051-1064). The Appeals Council again denied review, so ALJ Bentley's May 2020 written opinion is the Commissioner's final decision for purposes of this appeal. *See* 20 C.F.R. §§ 404.981, 416.1481.

## Decision of the Administrative Law Judge

ALJ Bentley made his decision at step five of the sequential evaluation. He found that, from February 16, 2010 through March 27, 2016, the claimant had the residual functional capacity (RFC) to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except that she could only occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl, and that she could never climb ladders/scaffolds and must avoid unprotected heights and dangerous moving machinery, as well as concentrated exposure to dust, fumes, odors, and poorly ventilated areas. Furthermore, he found she would have required an assistive device for safe ambulation on uneven surfaces. Additionally, he found she could understand, remember, and apply simple and detailed instructions; concentrate and persist for extended periods in order to complete simple and detailed work tasks with routine supervision; interact and respond appropriately to others in a stable workplace; and adapt to a routine work setting where changes are infrequent, well-explained, and introduced gradually; but that she could only occasionally have work-related interaction with the general public (Tr. 1386). The ALJ concluded that although the claimant could not return to her past relevant work, she was nevertheless not disabled because there was work she could perform, *i. e.*, furniture rental consultant, children's attendant, investigator, and dealer accounts, as well as call out operator and surveillance system monitor (Tr. 1063-1064).

## Review

The claimant's sole contention of error is that the ALJ failed to properly assess the treating physician opinion of Dr. Carol Gambrill. The undersigned Magistrate Judge agrees, and the decision of the Commissioner should be reversed.

The ALJ found that the claimant had the severe impairments of lumbar spine degenerative disc disease; bilateral knee degenerative joint disease; diabetes mellitus type II with peripheral neuropathy; fibromyalgia; morbid obesity; COPD; tobacco abuse; major depressive disorder, recurrent, severe, without psychotic symptoms; and anxiety (Tr. 1381). Additionally, he found she had the non-severe impairments of migraine headaches, anemia, gout, right lateral epicondylitis, and enlarged liver (Tr. 1381-1382). The relevant medical evidence shows that in 2011, the claimant weighed over 350 pounds, had an antalgic gait pattern, and had decreased range of motion in her lumbar spine (Tr. 351). As far back as 2006, an MRI of the lumbar spine revealed degenerative disc disease at L5-S1 with no specific nerve root compression (Tr. 499). In 2012, she was receiving injections for lateral epicondylitis of the right elbow (Tr. 339, 341). She also was treated by Dr. Isabel Vega that same year for, *inter alia*, degenerative joint disease and pain in the joints at multiple sites, as well as gout, diabetes, and morbid obesity (Tr. 365). In 2014, Dr. Patrick O'Neill noted that an x-ray showed almost no disc left at L5 in her sacrum, causing severe pain with all range of motion and with walking (Tr. 531). She continued to receive treatment for back pain in 2015, and treatment notes state that symptoms were aggravated by ascending stairs, bending, and daily activities, and alleviated by pain meds/drugs and

rest (Tr. 562). A January 2015 MRI of the lumbar spine revealed a disc extrusion at L5-S1 resulting in mild central canal and bilateral neural foraminal stenosis (Tr. 635).

Dr. Chad Crawley noted she had good range of motion in her knees ("almost hyperextension"), and no evidence of instability, but experienced pain along the medial joint line of both knees (Tr. 351). Dr. Crawley diagnosed the claimant with moderate osteoarthritis in her knees and a possible medial meniscus tear in her right knee (Tr. 351). A November 2010 x-ray showed mild degenerative change of the right knee, greater in the medial tibiofemoral joint compartments, and an MRI of the claimant's right knee conducted on January 7, 2011, revealed maceration of the medial margin of the medial meniscus, edema of the medial collateral ligament, a small joint effusion, and an injury or degenerative change in both the medial epicondylar region and the medial tibial plateau region (Tr. 360, 399). Thereafter, Dr. Crawley administered corticosteroid injections in the claimant's right knee in January 2011, September 2011, October 2012, and June 2014, and in both knees in March 2012, March 2013, and October 2013 (Tr. 340, 345, 349, 479-480, 482-483). Additionally, Dr. Crawley administered a series of three viscosupplement injections in the claimant's right knee in October 2011 (Tr. 341-343). A whole-body bone scan performed on November 11, 2012, revealed a likely degenerative or stress related right knee injury, but no spinal abnormalities (Tr. 373). In a treatment note dated March 15, 2013, Dr. Crawley indicated an x-ray of the claimant's right knee taken that day revealed severe varus deformity with bone-on-bone contact in the medial department, lateral psuedosubluxation of the tibial plateau, advanced arthritic changes at the patellofemoral joint, and spur formation in all three compartments (Tr. 484). His

impression was end stage degenerative joint disease of the right knee (Tr. 484). At a follow-up appointment on October 17, 2013, Dr. Crawley noted the claimant did well with her prior injections, and on examination found mild swelling, effusion, and crepitation in her knees; reduced range of motion bilaterally; and pain with active range of motion testing (Tr. 479-480). By June 30, 2014, the claimant's range of motion in her right knee improved but remained reduced and her gait had a limp (Tr. 511). In late 2014, Dr. O'Neill observed that the claimant's degenerative joint disease of the knee left her with almost no cartilage in either knee, although the right was worse than the left (Tr. 531, 582). He noted she needed knee replacements but that they would not be available until she lost a significant amount of weight (Tr. 531, 582). The claimant received another injection on the right knee on December 18, 2015 (Tr. 902).

    Dr. Ronald Schatzman conducted a physical consultative examination of the claimant on August 15, 2013 (Tr. 460-469). He noted there was no edema in her knees, and stated that due to her size, he "basically [couldn't] do a knee exam," but found full range of motion in her knees (Tr. 462-464). Additionally, Dr. Schatzman found the claimant was non-tender with full range of motion in her cervical spine, thoracic spine, and lumbar-sacral spine (Tr. 462-464). Although he stated in the report that heel/toe walking was normal, he actually indicated on the backsheet for the lumbosacral spine that she was too heavy for heel/toe walking and too obese to assess for muscle spasm (Tr. 462, 467). Dr. Schatzman noted the claimant had a broad-based waddling gait consistent with her weight and did not require a walking aid (Tr. 462). He diagnosed her with morbid obesity,

diabetes mellitus, and tobacco abuse, and by history, gout, panic attacks, fibromyalgia, carpal tunnel, and knee pain (Tr. 462).

The claimant established care with Dr. Carol Gambrill on August 8, 2014 (Tr. 538, 569). Thereafter, Dr. Jennifer Kim, supervised by Dr. Gambrill, treated the claimant for, *inter alia,* obesity, back pain, and diabetes (Tr. 562-574). An x-ray of the claimant's lumbar spine taken on September 26, 2014, revealed stable lumbosacral discogenic and spondylotic degenerative changes and no acute radiographic abnormality (Tr. 577). Dr. Kim's physical examination of the claimant on December 8, 2014, was normal except for her finding that the claimant was obese and had a protuberant abdomen with scarring (Tr. 572). In the claimant's treatment plan for obesity, Dr. Kim noted she "will continue ambulating [and] seeing a nutritionist." (Tr. 572). At a follow-up appointment on January 12, 2015, the claimant reported that using a cane relieved some of her knee pain (Tr. 562). Dr. Kim recommended that the claimant remain active and continue with her diet (Tr. 566). Pain management notes from that same month indicate the claimant had tenderness in the knee and in the lumbar spine, as well as multiple fibromyalgia trigger points, and range of motion testing revealed stiffness and guarding, although strength was intact (Tr. 598).

Dr. Gambrill completed a form titled "Physical Residual Functional Capacity Questionnaire" on November 5, 2014, and stated her opinion was applicable beginning August 8, 2014 (Tr. 538-542). She opined that during an eight-hour workday, the claimant could sit in one-hour increments for about four hours total, could walk one block before needing to rest, and could stand in forty-five-minute increments for less than two hours total (Tr. 538-542). Additionally, she opined that the claimant needed to walk for five

minutes every hour, needed a sit/stand option allowing her to change positions at will, and would likely need unscheduled breaks every two hours for fifteen minutes at a time (Tr. 540). As to postural limitations, Dr. Gambrill found that the claimant could frequently lift less than ten pounds and occasionally twist, but could never stoop, bend, crouch, or climb ladders or stairs (Tr. 541). Dr. Gambrill further indicated that the claimant would be absent from work more than four days per month (Tr. 535, 541). On a form titled "Medical Opinion Re: Sedentary Work Requirements," Dr. Gambrill opined that the claimant required an assistive device for even occasional standing and/or walking, could not sustain activity at a pace with the attention to task required in the competitive workplace, would have significant difficulty concentrating due to symptomology, could not sustain normal work stress, and could not attend any employment on a sustained basis (Tr. 537). As support for these opinions, Dr. Gambrill noted the claimant had osteophytes in her lumbar spine, lumbar degenerative joint disease, and osteoarthritis in her knee, and was seeing an orthopedist for her knee, whose records Dr. Gambrill further noted were "pending." (Tr. 537-538).

On September 9, 2013, state reviewing physician Dr. Kenneth Glass reviewed the record and found that the claimant could perform the full range of medium work (Tr. 113-14). His findings were affirmed on review (Tr. 126-27).

At the first administrative hearing, the claimant testified she was unable to work due to a herniated disc, degenerative disc disease, osteoarthritis, inability to concentrate, pain in her knees, and panic attacks (Tr. 64). She further testified that she could sit for fifteen minutes before needing to change positions, could walk less than five minutes before

-10-

needing to sit down, spends about five hours each day lying down, and was unable to walk stairs, kneel, crouch, crawl, stoop, and balance (Tr. 65-66).  As to her daily activities, the claimant stated that she sits down when she cooks, uses a riding cart when she grocery shops, does not attend her children's school activities, and that her children do most of the sweeping and mopping, carry in all of the groceries, and assist her with bathing and dressing (Tr. 70-73, 81).

In his written opinion at step three, the ALJ, *inter alia*, acknowledged the claimant's obesity and that it was not a listed impairment, but that he had considered its effects on her functioning.  However, he made no specific assessment as to the effect of her morbid obesity on the RFC at step four, nor did he address its effects in combination with her other severe impairments despite a number of records indicating that her obesity directly affected her additional severe impairments.  At step four, the ALJ summarized the claimant's hearing testimony, K.C.T.'s testimony from the 2018 hearing, and the medical evidence in the record (Tr. 1387-1396).  As relevant here, ALJ Bentley noted Dr. Crawley's treatment notes and the 2013 x-ray, as well as the objective testing related to the claimant's back (Tr. 1387-1388).  As to Dr. Schatzman's opinion, the ALJ recited his finding that the claimant's heel/toe walking was normal, missing the actual backsheet indicating the claimant was too heavy to assess this (Tr. 1388).  The ALJ paid particular attention to notes where the claimant referenced using a cane or walker but was not prescribed one, and noted that Dr. Schatzman found she was able to ambulate without one, and that she was only prescribed a wheelchair after the closed period (Tr. 1388-1389, 1391).  Ignoring the fact that doctors refused to perform knee surgery on the claimant until she lost a significant amount of

weight, the ALJ interpreted the evidence to mean that the orthopedic surgeons did not recommend a knee replacement (Tr. 1392). He thus concluded that the claimant could stand/walk for six hours in an eight-hour workday and only use an assistive device for uneven surfaces (Tr. 1392). As to the opinion evidence, the ALJ summarized Dr. Gambrill's opinion but gave it diminished, rather than controlling, weight (Tr. 1392-1393). He noted that she was not a specialist, and acknowledged she referenced objective imaging results to support her opinion, but found the claimant reported improvement on pain medication (Tr. 1392). He further found that her statement that the claimant walked with a cane was inconsistent with "largely normal examination findings prior to February 2016" (Tr. 1393). He gave diminished weight to the opinions of the state reviewing physicians that she could perform medium work (Tr. 1393).

The claimant asserts that the ALJ erred in evaluating Dr. Gambrill's treating physician opinion, and the undersigned Magistrate Judge agrees.[3] The medical opinions of treating physicians are entitled to controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "consistent with other substantial evidence in the record." *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004) (*quoting Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003)). When a treating physician's opinion is not entitled to controlling weight, the ALJ must determine the proper weight. The pertinent factors include the following: (i) the length of the

---

[3] Here, the claimant's application for Title II benefits was filed March 28, 2011. The undersigned Magistrate Judge recognizes that for claims filed on or after March 27, 2017, medical opinions are evaluated under a different standard pursuant to 20 C.F.R. § 404.1520c, which is not applicable here.

treatment relationship and the frequency of examination; (ii) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (iii) the degree to which the physician's opinion is supported by relevant evidence; (iv) consistency between the opinion and the record as a whole; (v) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (vi) other factors brought to the ALJ's attention which tend to support or contradict the opinion. *Watkins*, 350 F.3d at 1300-1301 (*citing Drapeau v. Massanari,* 255 F.3d 1211, 1213 (10th Cir. 2001)). If the ALJ decides to reject a treating physician's opinion entirely, he is required to "give specific, legitimate reasons for doing so." *Id.* at 1301 [quotations and citations omitted]. In sum, it must be "clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reasons for that weight." *Id.* at 1300 (*citing* Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (July 2, 1996)).

Although the ALJ noted the proper analysis at the outset of step four, he failed to properly apply it. Here, the ALJ assigned a "weight" to Dr. Gambrill's opinion and made an attempt at the *Watkins* factors, but nevertheless failed to properly apply them. Furthermore, the ALJ focused on times when the claimant reported pain improvement rather than improvements in her actual back and knee impairments, for which she continued to seek out and receive treatment, as well as repeated notations in the record that her weight was a major obstacle to resolving her other impairments. Additionally, he acknowledged that the claimant was in a wheelchair shortly after the closed period ended, but failed to address how that *supported* the claimant's claim of worsening symptoms over the years and her longitudinal shift from needing a cane over uneven surfaces (at a

minimum) to the wheelchair shortly after the close period. *See Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004) (noting that the ALJ may not "pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence.") (*citing Switzer v. Heckler*, 742 F.2d 382, 385-386 (7th Cir. 1984)).

The undersigned Magistrate Judge thus finds that the ALJ failed to properly assess the evidence regarding the claimant's physical impairments. The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (*e. g.*, laboratory findings) and nonmedical evidence (*e. g.*, daily activities, observations)." Soc. Sec. Rul. 96-8p, 1996 WL 374184, at *7 (July 2, 1996). "When the ALJ has failed to comply with SSR 96-8p because he has not linked his RFC determination with specific evidence in the record, the court cannot adequately assess whether relevant evidence supports the ALJ's RFC determination." *Jagodzinski v. Colvin*, 2013 WL 4849101, at *2 (D. Kan. Sept. 11, 2013) (*citing Brown v. Commissioner of the Social Security Administration*, 245 F. Supp. 2d 1175, 1187 (D. Kan. 2003)).

Although the ALJ *did* include some postural and environmental limitations related to the claimant's physical impairments in the RFC, the ALJ has connected no evidence in the record to instruct this Court as to how such a limitation accounts for *each* of the claimant's severe impairments, *i. e.*, lumbar spine degenerative disc disease; bilateral knee degenerative joint disease; diabetes mellitus type II with peripheral neuropathy; fibromyalgia; morbid obesity; COPD; tobacco abuse; major depressive disorder, recurrent, severe, without psychotic symptoms; and anxiety. *See Timmons v. Barnhart*, 118 Fed. Appx. 349, 353 (10th Cir. 2004) (finding the ALJ should have "explained how a 'severe'

impairment at step two became 'insignificant' at step five."); *Hamby v. Astrue*, 260 Fed. Appx. 108, 112 (10th Cir. 2008) ("In deciding Ms. Hamby's case, the ALJ concluded that she had many severe impairments at step two. He failed to consider the consequences of these impairments, however, in determining that Ms. Hamby had the RFC to perform a wide range of sedentary work."). Additionally, it is patently unclear how the claimant could perform the sitting, standing, and walking requirements of light work given the evidence in the record as to her combination of impairments including, at the very least, her degenerative disc disease, bilateral knee degenerative joint disease, and morbid obesity. *See* Soc. Sec. Rul. 19-2p, 2019 WL 2374244, at *4-5 & n.14 (May 20, 2019) ("The combined effects of obesity with another impairment(s) may be greater than the effects of each of the impairments considered separately. For example, someone who has obesity and arthritis affecting a weight-bearing joint may have more pain and functional limitations than the person would have due to the arthritis alone."). Here, it appears the ALJ simply rejected the state reviewing physician opinions that she could perform medium work while also rejecting Dr. Gambrill's opinion and ignoring evidence that the claimant's obesity further affected her ability to perform work functions, as well as evidence that surgeons *had* recommended knee replacements, and that she continued to seek treatment for her pain-producing impairments. The undersigned Magistrate Judge finds that this constitutes reversible error.

In light of the number of remands that have already occurred in this case, as well as the length of time this case has been pending, the undersigned Magistrate Judge "acknowledges Claimant's request for a remand with instructions to award benefits," and

"declines to remand with an award instruction on this occasion but reserves the right to do so in any future appeal should the Commissioner fail in the execution of her obligation under the law as blatantly as was done in this latest decision." *Wilkerson v. Colvin*, 2014 WL 1217768, at *4 (E.D. Okla. Feb. 28, 2014). *But see Wilkerson v. Colvin*, 2016 WL 4530625, at *2 ("Here, the Social Security Administration has been given numerous opportunities to properly evaluate the same issue . . . This has taken ten years. . . . Under these circumstances, the undersigned Magistrate Judge finds that additional fact finding would only serve the purpose of delay of the receipt of benefits, and that a ten-year delay involving three appeals to this Court was sufficient time to allow the Social Security Administration to properly adjudicate the Plaintiff's disability application.") (*affirmed and adopted by Wilkerson v. Colvin*, 2016 WL 4532119 (E. D. Okla. Aug. 29, 2016) (slip op.)).

Because the ALJ failed to properly evaluate the evidence available in the record, the decision of the Commissioner should be reversed and the case remanded to the ALJ for a proper analysis in accordance with the appropriate standards. If such analysis results in adjustment to the claimant's RFC, the ALJ should re-determine what work, if any, the claimant can perform and ultimately whether he is disabled.

## Conclusion

The undersigned Magistrate Judge finds that correct legal standards were not applied by the ALJ and that the decision of the Commissioner is therefore not supported by substantial evidence. Accordingly, the Magistrate Judge RECOMMENDS that the ruling of the Commissioner of the Social Security Administration be REVERSED and the case REMANDED for further proceedings not inconsistent herewith. Any objections to

this Report and Recommendation must be filed within fourteen days.  *See* Fed. R. Civ. P. 72(b).

**DATED** this 7th day of March, 2022.

_____
**STEVEN P. SHREDER**
**UNITED STATES MAGISTRATE JUDGE**